**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-11870

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JULIAN LOPEZ,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cr-60128-RAR-2

_____

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

The U.S. Sentencing Guidelines provide that, "in the case of a jointly undertaken criminal activity," a defendant's guideline range is determined based on the acts of others that were (i) within

the scope the jointly undertaken criminal activity, (ii) in further-
ance of that criminal activity, and (iii) reasonably foreseeable in
connection with that criminal activity.    *See* U.S.S.G.
§ 1B1.3(a)(1)(B).

Julian Lopez pled guilty to two counts of health care fraud.
Applying § 1B1.3(a)(1)(B), the district court held him responsible
for the $3.2 million loss caused by the fraudulent Medicare claims
of a business called One Medical Services.  Mr. Lopez contends that
this was error because the government did not present evidence
that he and One Medical or its owner/operator "jointly un-
dert[ook] criminal activity" resulting in the $3.2 million loss.

After review of the record, we agree with Mr. Lopez.  We
therefore vacate his sentence and remand for further proceedings.

## I

Leonel Diaz Castillo and Mr. Lopez were charged in a 10-
count indictment in the Southern District of Florida.  The indict-
ment charged Mr. Lopez with four counts of health care fraud, in
violation of 18 U.S.C. § 1347.  He pled guilty to Counts 1 and 2 of
the indictment without a plea agreement.

## A

Mr. Lopez and the government submitted to the district
court a written Agreed Factual Basis for Guilty Plea.  In that docu-
ment, Mr. Lopez stipulated to the following:

From February to September of 2021, Mr. Lopez knowingly
and willfully executed a scheme to defraud Medicare.

It was a purpose of the scheme . . . for [Mr. Lopez] and his accomplices to unlawfully enrich themselves by . . . (a) offering money and paying for beneficiaries' names and unique Medicare enrollment numbers; (b) submitting and causing the submission of false and fraudulent claims to Medicare for durable medical equipment ("DME") that was not medically necessary, not eligible for Medicare reimbursement, and not actually provided to Medicare beneficiaries, through a DME company called One Medical Services; (c) concealing the receipt of the fraud proceeds; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

One Medical was owned and operated by Mr. Castillo. Mr. Lopez "obtained Medicare beneficiary cards, which One Medical Services used to submit false and fraudulent claims to Medicare." He "knew how the cards would be used and willfully participated in the scheme."

On February 17, 2021, Mr. Lopez purchased ten Medicare beneficiary cards. One Medical submitted claims to Medicare using three of these cards. Two of those claims were for $4,000 each. "Th[o]se claims were false and fraudulent because One Medical Services never provided the items or services described in the claims."

"In connection with this scheme, One Medical Services submitted and caused the submission of a total of approximately

$3,248,540 in false and fraudulent claims to Medicare[.]" As a result, One Medical "received payments from Medicare in the amount of approximately $1,496,412."

**B**

Mr. Lopez's presentence investigation report stated that he "jointly conspired" to obtain Medicare beneficiary cards to submit fraudulent claims to Medicare. It therefore asserted that, under U.S.S.G. § 1B1.3(a)(1)(B), he was responsible for the total loss caused by One Medical: $3,248,540. That amount resulted in a 16-level enhancement under § 2B1.1(b)(1)(I).

Mr. Lopez objected. He argued that he should be accountable only for the $8,000 in losses that resulted from the two claims that were submitted using the Medicare beneficiary cards he obtained on February 17, 2021. According to Mr. Lopez, he "did not know who was going to use or submit the fraudulent claims" using the beneficiary cards that he obtained. He "d[id] not know who Leonel Diaz Castillo" was and he "did not know how One Medical was involved in the offense." Although he admitted that he "purchase[d] and s[old] the beneficiary cards with the knowledge that they would be used to submit a false or fraudulent claim to Medicare," Mr. Lopez asserts that he didn't "sell the cards to Mr. Diaz Castillo . . . or anyone who he knew to be involved with One Medical."

The government filed a written response to Mr. Lopez's objections. It argued that Mr. Lopez had "incorrectly minimize[d] his participation in the scheme" and asked the district court to "impose

a sentence that reflects the foreseeable loss caused by the scheme: $3.2 million."

The government attached as exhibits to its response the translated transcripts of two video-recorded conversations, each involving three speakers. The videos themselves are not in the record. The record does not indicate whether the three individuals in the first video are the same individuals in the second video. And it does not indicate when these conversations occurred or which conversation happened first.

The transcripts do not identify who the speakers are; rather, they are referred to as "Male Voice 1," "Male Voice 2," and "Male Voice 3." So we do not know if any of the speakers was acting on behalf of One Medical. We also do not know from the transcripts whether Mr. Lopez was one of the speakers. But, at Mr. Lopez's sentencing hearing, his counsel assumed that he was. For purposes of this appeal, we assume that Mr. Lopez was one of the three speakers in each transcript.

In the government's first exhibit, Male 2 said to Male 1, "[t]hey took like five hundred numbers at eighty pesos. And they're going to pay me at a hundred pesos." In response, Male 1 asked, "[a]re they going to pay you a hundred pesos for it?" Male

2 answered, "[a]t one hundred pesos.  Three hundred pesos for the three numbers they got."[1]

Later, Male 1 asked Male 2, "how much did we tell these people that we were going to pay the first day?"  "I don't know anything," Male 2 replied.  "I have three hundred pesos with me, and that's what he told me. . . . [W]hat was your agreement with [them]?"  Male 1 answered, "I think that I had said twenty-five pesos, I don't remember."  "Neither do I," Male 2 said.  Then Male 1 suggested, "[l]et's give one hundred pesos to them and one hundred pesos to each and that's it."  "Sounds good," Male 2 replied.

After that, Male 2 said:

> [L]et them check [the numbers I gave you].  I don't know [why] they don't match . . . their information. . . . Because I told him, "[d]ude, but really tell me why these three did not work, so I can tell him, because he told me . . . everything was free Medicare."  And then he told me [that] he called the doctor and the doctor told him . . . "[t]he numbers don't match.  I don't know [why] that is. . . .  I cannot bill them."

Then Male 1 asked, "[t]hese three will get billed, right?"  "These three will get billed," Male 2 confirmed that point.  "Let him check so that you can see that these three will get billed, and they will not

---

[1] At Mr. Lopez's sentencing hearing, the government proffered that, when the individuals in the videos say "pesos," they are referring to United States dollars.  Mr. Lopez has not contested that assertion.

take a single dollar out of it. . . . I don't know [why the numbers don't match]. But if he gets a thousand, he pays us a thousand."

A few moments later, Male 1 answers a phone call from Male 3. He says to Male 3, "make them explain it to you so that I can explain [why the numbers are not working]." Male 3 responded, "it has to be free Medicare and I don't know [why] the information does not match. It looks like there is a wrong number, I don't know[.]"

In the government's second exhibit, Male 3 asked Male 2, "[i]s that Medicare with everything free?" "Yes, all free Medicare," Male 2 replied. Then Male 2 asked, "[h]ow long does it take to get the money?" Male 3 responded:

> No, just let me check it out. . . . I'm going to give it to him today. I guess that tomorrow . . . the clinic is in. They have everything going well, you hear? They go there . . . and they work. They're not going to . . . force anything, you know? They're going to check it out. He has some software . . . from that Medicare thing, they check it out and they know if it's enrolled, if they're dead, if . . . well you know. . . . And they closed a clinic that, you know, it was a shame. And [unintelligible] are my friends.

Asking about someone else, Male 3 then asked Male 2, "you don't know where they're from or anything? No idea?" "That guy is my partner," Male 2 said. "He was recommended by a friend of mine[.]" "And he's paid very, very well," Male 2 added. Male 3

replied, "Alright, if this works we can do it easily; a hundred or two hundred thousand bucks."

## C

The government introduced no further evidence and presented no witnesses at Mr. Lopez's sentencing hearing.

Mr. Lopez's counsel argued the following:

> [M]y understanding from the review of the evidence is that there's a confidential informant, . . . and that individual sells to Mr. Lopez a series of . . . beneficiary ID numbers . . . .  From there on out, Mr. Lopez sells those cards . . . down the stream of Medicare fraud commerce . . . until they are [used] by one of these clinics, and it's determined that either two or three of those cards actually work.  And so Mr. Lopez is paid by an unknown individual, not anyone who's named in the indictment, not anyone who . . . we know, or there's no evidence to suggest that is associated with One Medical.  That person then reimburses Mr. Lopez $300 . . . for those two or three cards, and . . . the $300 is split between Mr. Lopez, . . . the government source . . . [and] another individual that was a go-between, another broker down the stream of commerce.

> So the argument we're making is that Mr. Lopez is essentially . . . an independent contractor who is out buying . . . these IDs, and eventually he then sells them off into this stream of criminal commerce . . . and that down that stream, they get to One Medical,

who eventually is the one who processes them and submits claim[s] using them.

But . . . Mr. Lopez does not conspire with One Medical. He doesn't conspire with any of the individuals associated as being part of One Medical. It's simply circumstances that lead to Mr. Lopez buying and selling those IDs that eventually gets taken up by One Medical, and One Medical bills them.

But certainly, I would submit to the Court that there's no evidence that Mr. Lopez agreed to jointly undertake any criminal activity with One Medical, and that he was never acting in furtherance of One Medical[.]

The district court and the government understood Mr. Lopez to be arguing that he couldn't be held accountable for the intended losses proximately caused by One Medical because, although he knew that the beneficiary cards would be used by someone to commit fraud, he didn't know that the end user would be One Medical. For example, at one point the court said, "I understand defense's view is he had to have known that the defrauding of Medicare was by way of One Medical Services." And the government argued, "yes, Mr. Lopez may not have known the words, 'One Medical,' but he knew somebody who was sharing information about these claims being billed to Medicare fraudulently."

After both parties presented their arguments, the district court overruled Mr. Lopez's objection concerning intended loss. It believed that the transcripts showed that Mr. Lopez "was working

in concert as part of a greater scheme." So "even if he didn't personally procure each of the cards that perpetrated the 3.2 million [dollar] scheme, it's hard to say that" he didn't "agree[ ] to jointly undertake it." The court found that "[i]t [was] foreseeable, given his statements to individuals in the conspiracy and scheme, that this would generate substantial losses. The more cards procured, the more money they can get." And it reasoned that the Sentencing Guidelines don't foreclose Mr. Lopez from being held responsible for the total loss "simply because he didn't know . . . the end user of the cards . . . or didn't know their name." The court therefore concluded that it was appropriate to hold Mr. Lopez responsible for $3.2 million in intended loss under § 1B1.3(a)(1)(B).

Having concluded that the PSI correctly calculated Mr. Lopez's guideline range as 37 to 46 months, the district court varied downward, sentencing Mr. Lopez to 30 months' imprisonment followed by three years of supervised release and nearly $1.5 million in restitution.

## II

"When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence." *United States v. Isaacson*, 752 F.3d 1291, 1305 (11th Cir. 2014) (quoting *United States v. Washington*, 714 F.3d 1258, 1361 (11th Cir. 2013)). "In its guidelines calculations, the district court's factual

findings are reviewed for clear error." *United States v. Nerey*, 877 F.3d 956, 977 (11th Cir. 2017).

Under clear error review, a factual "finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017). "Although review for clear error is deferential, a finding of fact must be supported by substantial evidence." *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007). "Substantial evidence . . . is more than a mere scintilla, but means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Urias-Orellana v. Bondi*, 607 U.S. 537, 544 (2026) (quotation marks omitted).

### III

Mr. Lopez challenges the finding that he is accountable at sentencing for the total $3.2 million in intended loss resulting from One Medical's fraudulent Medicare claims. The district court attributed that loss amount to Mr. Lopez under § 1B1.3(a)(1)(B). That provision states that, "in the case of a jointly undertaken criminal activity," a defendant's sentencing guideline range is determined based on the

> acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense,

or in the course of attempting to avoid detection or responsibility for that offense.

§ 1B1.3(a)(1)(B).

For Mr. Lopez to be held accountable for all of One Medical's fraudulent conduct, that conduct must have been within the scope of the criminal activity that he agreed to jointly undertake with One Medical. "Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." § 1B1.3, cmt. 3(B). *See also United States v. Isaacson*, 752 F.3d 1291, 1305 (11th Cir. 2014) ("Once the [d]istrict [c]ourt determines the precise scope of the defendant's agreement, the [c]ourt must then consider whether the conduct of his co-conspirators was 'in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant.'"); *United States v. Andrews*, 953 F.2d 1312, 1319 (11th Cir. 1992) ("Relevant acts in a conspiracy are those a defendant procured, counseled, or which were otherwise reasonably foreseeable by the defendant, but not acts in the conspiracy that were not within the scope of the defendant's agreement.").

In determining the scope of the criminal activity that the defendant agreed to jointly undertake, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *United States v. Hunter*, 323 F.3d 1314, 1319–20 (11th Cir. 2003) (quoting § 1B1.3, cmt. 3(B)). Significantly, "[a] defendant's mere awareness that he was part of a

larger scheme is alone insufficient to show that another individual's criminal activity was within the scope of the defendant's jointly undertaken criminal activity." *United States v. Whitman*, 887 F.3d 1240, 1248 (11th Cir. 2018) (quotation marks and brackets omitted). "But actions that suggest that the defendant was actively involved in a criminal scheme permit the inference that the defendant agreed to jointly undertake the scheme." *Id.* (quotation marks omitted).

Here, the government did not present evidence of conduct or statements from which it could be reasonably inferred that One Medical and Mr. Lopez—who sold two beneficiary cards that were used to submit $4,000 claims—agreed to jointly undertake criminal activity to the tune of $3.2 million in intended loss. The district court's finding that they had such an agreement is therefore clearly erroneous.

In the Agreed Factual Basis, Mr. Lopez admitted that he and "his accomplices" intended to pay for unique Medicare enrollment numbers and cause the submission of fraudulent Medicare claims. In light of that admission, it is reasonable to infer that Mr. Lopez and the two unnamed individuals in the transcripts are discussing that scheme (assuming that Mr. Lopez was one of the three speakers). But there is no evidence that Mr. Lopez or the other individuals in the transcripts agreed to jointly undertake a criminal scheme *with One Medical* or its owner, Mr. Castillo.

Neither the Agreed Factual Basis nor the transcripts indicate who Mr. Lopez's accomplices were. Thus, nothing in the record

shows that Mr. Lopez communicated with Mr. Castillo or anyone associated with One Medical.

That there was no such communication is not necessarily fatal to the government's theory that Mr. Lopez and One Medical jointly undertook a criminal scheme. As the district court correctly noted, a defendant can theoretically agree to jointly undertake criminal activity with unknown individuals. *See, e.g., United States v. LaFraugh*, 893 F.2d 314, 318 (11th Cir. 1990). But the court misunderstood Mr. Lopez's argument. He did not make a legal argument about the proper construction of § 1B1.3(a)(1)(B). Rather, his argument was (and is) a factual one: that the government has not presented evidence demonstrating an agreement between himself and One Medical. So, although it is not fatal, the lack of communication between Mr. Lopez and One Medical does not help the government prove an agreement between the two.

The facts (1) that Mr. Lopez and his accomplices sold beneficiary cards knowing they would be used to submit fraudulent claims, and (2) that those cards were ultimately used by One Medical to submit fraudulent claims, without more, also do not evince that Mr. Lopez and One Medical jointly undertook a multi-million dollar scheme. *Cf. Hunter*, 323 F.3d at 1320 (the fact that the defendant cashed nine counterfeit checks and knew others in the conspiracy did not automatically support the finding that she agreed to the entire scope of the conspiracy). "Where the buyer's purpose is merely to buy, and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two

beyond the sales agreement, no conspiracy has been shown." *United States v. Brazel*, 102 F.3d 1120, 1136 (11th Cir. 1997) (quoting *United States v. Beasley*, 2 F.3d 1551, 1560 (11th Cir. 1993)).

For example, suppose "Defendant A" and his accomplices operate a manufacturer of illicit narcotics, and "Company B" is a distributor of such narcotics. If Company B buys some narcotics from Defendant A's outfit, but also buys narcotics from other manufacturers, Defendant A could not be held accountable for all of the drugs that Company B distributed—unless there was evidence that they agreed to jointly undertake a drug-distribution scheme, such as pooling resources, sharing profits, or working together. *Cf. United States v. Harbin*, 601 F.2d 773, 783 (5th Cir. 1979) (reversing defendant's conspiracy conviction because his taped conversations were consistent with him "distributing cocaine as an independent dealer outside the conspiracy").

The Application Notes to the Sentencing Guidelines provide a similar illustration:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q . . . pools his resources and profits with four

other street-level drug dealers.  Defendant Q is en-
gaged in a jointly undertaken criminal activity and,
therefore, he is accountable . . . for the quantities of
drugs sold by the four other dealers[.]"

§ 1B1.3, cmt. 4(C)(vi).  *See also* cmt. 4(C)(vii).

Here, there is no evidence that Mr. Lopez and One Medical had anything more than a one-time buyer-seller relationship.  *See United States v. Mercer*, 165 F.3d 1331, 1336 (11th Cir. 1999) (revers-ing conspiracy conviction where "there [was] no evidence of any-thing other than at most a buyer-seller relationship").  Indeed, the record does not even reveal how One Medical obtained the bene-ficiary cards that Mr. Lopez procured on February 17, 2021, whether directly from Mr. Lopez or otherwise.

The government relies on *United States v. Whitman*, 887 F.3d 1240, 1248–50 (11th Cir. 2018), but that case demonstrates just how insufficient the evidence is here.  In *Whitman*, there was significant evidence of a conspiracy.  Mr. Whitman bribed three government contractors to use his trucking company to ship military equipment around the country. *See id.* at 1243.  The four of them devised ship-ment requirements for jobs that "all but guaranteed" that Mr. Whitman's company would receive the contracts.  *Id.*  "In ex-change for steering profitable contracts to [his company], [Mr.] Whitman paid the government employees in cash and goods." *Id.* at 1244.  The conspirators' statements corroborated the existence of their criminal agreement.  Mr. Whitman told one of his conspira-tors, Potts, that he "had McCarty working for him" and that he was "paying him to get him as many loads as possible."  *Id.* (brackets

omitted).  When two of them discovered that they were under criminal investigation, they called McCarty "to give him a heads up," and the three met several times during the investigation to "touch base" and "find out what was going on."  *Id.*

There is no such evidence of an agreement between Mr. Lopez and One Medical or Mr. Castillo here.  We do not suggest that, in every case, § 1B1.3(a)(1)(B) requires the same degree of evidence that existed in *Whitman*.  But there must at least be substantial evidence supporting the finding that the defendant agreed to jointly undertake criminal activity with the person whose acts are to be imputed.

The government argues that one of the statements in the second exhibit—"if this works we can [make] a hundred or two hundred thousand bucks"—demonstrates that Mr. Lopez's scheme was far bigger then just ten beneficiary cards.  Maybe so, but that doesn't evince an agreement *with One Medical*.

Finally, whether One Medical's acts were foreseeable to Mr. Lopez is of no consequence in the absence of an agreement.  "Only after the district court makes individualized findings concerning the scope of criminal activity the defendant undertook is the court to determine reasonable foreseeability."  *Hunter*, 323 F.3d at 1319.  "Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)."  § 1B1.3, cmt. 3(B).  *See also Isaacson*, 752 F.3d at 1305; *Andrews*, 953 F.2d at 1319.

## IV

Because the government did not adduce substantial evidence proving an agreement between Mr. Lopez and One Medical, Mr. Lopez's offense level cannot be based on the acts of One Medical. We therefore vacate Mr. Lopez's sentence and remand for further proceedings.

**VACATED AND REMANDED.**